**KIRBY McINERNEY LLP**
ROBERT J. GRALEWSKI, JR. (CA Bar No. 196410)
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044
BGralewski@kmllp.com

LAUREN WANDS
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
LWands@kmllp.com

**WOLF, HALDENSTEIN, ADLER, FREEMAN & HERZ LLP**
MARK C. RIFKIN
THOMAS H. BURT
LILLIAN R. GRINNELL
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
rifkin@whafh.com
burt@whafh.com
grinnell@whafh.com

*Counsel for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Joseph Vettel and L.K., a minor, by and through her guardian ad litem Lauren Kremer, Individually, and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>Sephora USA, Inc.,<br><br>Defendant. | Case No. ____________________<br><br>**CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

NATURE OF THE ACTION AND OVERVIEW ........ 1

JURISDICTION AND VENUE ........ 6

PARTIES ........ 7

FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS ........ 8

A. Sephora Sells Thousands of Products Containing Ingredients Unsuitable for Young Skin ........ 8

B. Sephora's Unfair, Fraudulent, and Misleading Marketing ........ 22

CLASS ALLEGATIONS ........ 31

CAUSE OF ACTION ........ 34

DEMAND FOR RELIEF ........ 37

Plaintiffs Joseph Vettel and L.K., a minor, by and through her guardian ad litem Lauren Kremer ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon personal knowledge as to themselves and their own acts and experiences, and upon information and belief as to all other matters. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, including, without limitation: (a) the review and analysis of literature concerning the chemical components of Sephora's products, (b) the review and analysis of medical and scientific literature concerning the risks those chemicals pose to young users; and (c) the review of other publicly available information concerning Sephora, its products, and its marketing practices.

## NATURE OF THE ACTION AND OVERVIEW

1. Sephora has built a beauty and skincare product empire by making these products aspirational, addictive, and social. In recent years, it found an especially valuable new customer: children.

2. Enticed by Sephora's wide-spread marketing scheme, tweens and teens started flocking to Sephora stores and scrolling Sephora's website searching for the same serums, exfoliants, acids, retinoids, brightening treatments, peptide creams, and multi-step routines they started repeatedly seeing in TikTok videos, Instagram reels, "get ready with me" posts, influencer content, product "hauls," and unboxing videos. Sephora did not simply watch this phenomenon unfold from the sidelines. It cultivated it, monetized it, and positioned itself at the center of it.

3. But young skin is not adult skin. Children and adolescents do not ordinarily need products designed to erase wrinkles, reverse sun damage, stimulate collagen, fade age-related pigmentation, or aggressively exfoliate mature skin. Yet Sephora markets and sells thousands of products containing potent active ingredients that may be unnecessary, inappropriate, or harmful when used by young consumers, including alpha-hydroxy acids ("AHAs"), beta-hydroxy acids ("BHAs"), vitamin C derivatives, retinoids, peptides, and certain chemical sunscreen ingredients (collectively, and as defined further below, the "Unsuitable Chemicals"). These ingredients can

cause burning, peeling, irritation, inflammation, disruption of the skin barrier, heightened sun sensitivity, and, in some circumstances, systemic toxicity.

4. Sephora knows this. Its own website warns that several of the Unsuitable Chemicals—including retinoids, vitamin C, AHAs, BHAs, and peptides—"may not be necessary or appropriate for younger skin." Yet Sephora couches that warning in reassuring language in its Tweens and Teens Guide (as defined below), repeatedly emphasizing that "[e]veryone, regardless of age or skin type," can benefit from skincare and that young consumers should seek product recommendations from Sephora Beauty Advisors. The Tweens and Teens Guide thus simultaneously acknowledges that certain ingredients may be inappropriate for younger skin while conveying to young consumers that Sephora's broader skincare offerings are generally suitable so long as they exercise moderation and seek guidance.

5. Sephora's own corporate reporting identifies youth-skincare guidance as an action only recently implemented to prevent potential harm associated with the early use of cosmetic products. And after a formal investigation into Sephora's marketing of skincare to children, the Connecticut Attorney General just this year required Sephora to adopt safeguards concerning products that may be unsuitable for children under thirteen. These safeguards are a good first step but are inadequate. Worse, Sephora has not taken appropriate steps to ensure that all of these safeguards are being followed by its thousands of employees.

6. Sephora's admission that products it sells are unsuitable for children did not arise in a vacuum. For years, physicians, researchers, journalists, Sephora employees, regulators, and Sephora's own executives have been documenting the same phenomenon: increasingly young consumers are buying sophisticated skincare products, frequently after discovering them through social media, and layering multiple active ingredients together in routines designed for skin concerns they do not have. Although Sephora would like nothing more than to brush its active involvement in this phenomenon under the rug, Sephora actively cultivated it—at the expense of its customers' safety—to dramatically profit from it.

7. Deciding to exploit children in order to maximize its revenue, Sephora advertised product tie-ins with Disney Princesses and invested directly in creator-driven TikTok marketing that it knew at the time was heavily viewed by teenagers and tweens as young as eight years old. It benefited from the viral cycle through which influencers create demand, young consumers seek trending products at Sephora, and those consumers then post their own routines, reviews, "hauls,"[1] and unboxing videos, further amplifying the products. Its own North American chief executive publicly acknowledged the connection between TikTok virality and brands available at Sephora, observing that the overlap was "not by accident." And in express violation of California law, neither Sephora nor the influencers adequately disclosed the pecuniary relationship between Sephora and the influencers, which many had. Sephora stood to make more money if teenagers and tweens believed the influencers were delivering their own independent, unbiased opinions. But they were not.

8. As the so-called "Sephora Kids" phenomenon exploded, Sephora became an increasingly obvious destination for children seeking adult-style skincare. Elementary school-aged children and teenagers arrived at its stores already knowing which products they wanted from social media. Sephora permitted tweens to hold birthday celebrations at Sephora locations. At these celebrations, tweens were free to purchase products, and Sephora employees were not adequately trained to steer the tweens away from products containing Unsuitable Chemicals. Outside of the walls of Sephora stores, young influencers displayed Sephora products to audiences of other young consumers. And Sephora continued to place thousands of active skincare products within easy reach of those consumers. Indeed, there was no teenager or tween section in any Sephora store as there should be given the science and Sephora's knowledge of and involvement in the marketing of beauty and skincare products that Sephora knows is viewed millions of times a day by teenagers and tweens across the country.

[1] A "haul" video features and discusses a collection of products purchased during a shopping trip or otherwise received from a retailer or brand, often with the creator displaying, reviewing, or recommending the products to viewers.

9. Sephora even doubled down on its participation in the youth-skincare market by launching and promoting skincare brands developed for Gen Alpha, tweens, and teenagers, including Sincerely Yours, co-founded by a fifteen-year-old social media creator, and Evereden, a brand expressly formulated and marketed for young skin. Significantly, multiple products from both Sincerely Yours and Evereden contain one or more Unsuitable Chemicals, including malic acid, citric acid, salicylic acid, and ascorbic acid.

10. That development exposes the contradiction—and unfairness—at the heart of this case. Sephora plainly understands that young consumers constitute a distinct skincare market with different needs from those of adults. Yet Sephora expressly markets products as formulated for children, tweens, teenagers, and "developing skin" while selling those same young consumers products containing Unsuitable Chemicals that Sephora elsewhere warns "may not be necessary or appropriate for younger skin." And once those young consumers enter Sephora's stores, website, or app, they are exposed to a far broader assortment of adult skincare products—all mixed together without a clearly defined section separating products identified as appropriate for tweens and teens—containing stronger concentrations and combinations of the same active ingredients.

11. Sephora's warnings, to the extent they exist, are no answer and actually exacerbate the problem. Its youth-specific skincare guide on its website appears to be a very recent development, added only ***after*** the "Sephora Kids" trend had become a national phenomenon and ***after*** a state regulator had begun investigating Sephora's practices. And Sephora's guidance is inconsistent. It tells young consumers that "less is more," but also tells them that "[s]kincare isn't about age." It warns that certain active ingredients may not be appropriate for younger skin while simultaneously directing children and teenagers to consult a Sephora "Beauty Advisor" who is an inadequately trained retail salesperson.

12. Nor are meaningful warnings placed where they matter most. A young consumer can browse Sephora's shelves, product displays, makeup sections, skincare aisles, website, and app without encountering clear and conspicuous age-related warnings on many of the products containing Unsuitable Chemicals. The burden is effectively placed on the child—or her parent—to

know which chemical ingredients to identify, which combinations to avoid, and which products were designed for skin decades older than hers.

13. That is backwards. ***Sephora*** is the sophisticated retailer. Sephora selects the products it sells. Sephora controls its stores, website, app, product presentation, merchandising, and marketing. Sephora has access to the manufacturers' ingredient information. Sephora employs the Beauty Advisors it tells young consumers to consult. Sephora has studied the youth market, invested in the creator economy that reaches it, and benefited financially as skincare became a status symbol among children. Sephora is therefore uniquely positioned to provide clear, consistent, age-appropriate safeguards—and has repeatedly chosen not to do so.

14. The scale of the conduct is substantial. Unsuitable Chemicals are contained in over 1,600 products that Sephora sells, which is a majority of the skincare products offered on Sephora.com, including hundreds of products containing multiple active ingredients. These are not obscure products hidden in some remote corner of the website or retail store. They include bestselling and heavily promoted products from some of Sephora's most recognizable brands.

15. Sephora knows that the risk is magnified by the way young consumers actually use skincare—which is heavily influenced by creators on social media whose multi-step routines regularly feature multiple products used at once. A child may apply an exfoliating toner, followed by a brightening serum, followed by a retinoid, followed by another product containing an overlapping acid—without realizing that she has repeatedly exposed her skin to the same or similar active ingredients. Research examining youth skincare content on TikTok has documented precisely this problem.

16. Sephora's conduct is especially troubling because the solution is neither mysterious nor commercially impossible. Sephora could clearly separate youth-appropriate products from adult skincare. It could train employees comprehensively regarding both tweens and teens. It could provide prominent age-related warnings. It could ensure that product pages and physical displays clearly identify products that may be inappropriate for developing skin. It could stop placing the burden on children to decipher ingredient lists or seek out hidden guidance.

17. Instead, Sephora has tried to have it both ways. It welcomes young consumers, markets to the culture that drives them into its stores, profits from their fascination with sophisticated skincare, and increasingly develops products and retail experiences around them. At the same time, it distances itself from responsibility for what those consumers buy by offering limited, inconsistent, and belated guidance about products it knows may not be suitable for young skin.

18. Sephora cannot have it both ways. Indeed, its conduct is immoral and unethical.

19. Plaintiffs bring this action on behalf of persons and entities in the United States that purchased or otherwise acquired products from Sephora containing Unsuitable Chemicals for use by children twelve years old or younger (the "Tween Class") and teenagers ages thirteen through seventeen (the "Teen Class," and together, the "Classes") between September 4, 2022, and the date of this Complaint, inclusive (the "Class Period"). Plaintiffs seek restitution and injunctive relief under California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 *et seq.*, arising from Sephora's unfair and fraudulent business practices.

20. At bottom this case is not about banning skincare for children. To the contrary. It is about a sophisticated retailer's continuous and coordinated practice of creating, encouraging, and profiting from a youth-skincare market while withholding the clear, consistent, and conspicuous safeguards necessary to keep that market from becoming a chemistry experiment conducted on developing skin.

21. Sephora helped create the demand. Sephora has reaped windfall profits from the demand. Sephora knows the risks. It should bear responsibility for the consequences. And it should be forced to pay people back and change its ways.

## JURISDICTION AND VENUE

22. **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Classes consist of more than 100 members, and at least one member of the proposed Classes is a citizen of a state different from Defendant.

23. **Personal Jurisdiction.** This Court has personal jurisdiction over Defendant because Defendant is headquartered in this District and conducts substantial, continuous, and systematic business in this District, including through the operation of retail stores and the sale and marketing of the products at issue in this action. Moreover, the common marketing scheme and unfair and fraudulent business practices described herein emanated from Defendant's San Francisco headquarters.

24. **Venue.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant resides in this District for purposes of venue and is headquartered in this District.

## PARTIES

25. Plaintiff Joseph Vettel is a resident of San Diego County, California, and the parent of a teenage daughter. During the Class Period, Mr. Vettel purchased skincare products containing Unsuitable Chemicals from Sephora for his daughter, who was then sixteen years old, including but not limited to Drunk Elephant – T.L.C. Framboos Glycolic Resurfacing Night Serum and LANEIGE – Lip Sleeping Mask Intense Hydration Lip Treatment with Vitamin C. Mr. Vettel purchased these and other products in person at the Sephora store located at Mission Valley Mall in San Diego, California. Mr. Vettel's daughter became familiar with Sephora and its products through social media and through friends and fellow students at her school and as a result, asked Mr. Vettel to purchase the listed products for her from Sephora. Mr. Vettel placed his trust in Sephora and relied to his detriment on Sephora marketing and selling age-appropriate products, and he would not have purchased these products but for Sephora's long-term advertising campaign directed to tweens and teens.

26. Plaintiff L.K. is a thirteen-year-old minor residing in Alameda County, California, who brings this action by and through her guardian ad litem Lauren Kremer. During the Class Period, L.K. purchased, or her mother, Ms. Kremer, purchased for her, skincare products containing Unsuitable Chemicals from Sephora, including but not limited to Glow Recipe – Watermelon Glow PHA + BHA Pore-Tight Toner, Summer Fridays – Cloud Dew Gel Cream, and LANEIGE – Lip Sleeping Mask, Watermelon Pop. L.K. and Ms. Kremer purchased these and other products both

online through Sephora's website and in person at Sephora retail locations. L.K. and Ms. Kremer have shopped at Sephora locations including Fourth Street in Berkeley, California and Bay Street in Emeryville, California, and L.K. has additionally shopped at Sephora locations including Walnut Creek, California and The Grove in Los Angeles, California. In Sephora stores, L.K. has sought and received products recommendations from Sephora Beauty Advisors, including by asking which products they believed would be best for her skin. L.K. also follows multiple social media influencers on YouTube who post Sephora and skincare-related content, including product "hauls," skincare routines, and recommendations for skincare products and as a result, purchased or asked Ms. Kremer to purchase the listed products for her from Sephora. L.K. and Ms. Kremer placed their trust in Sephora and relied to their detriment on Sephora marketing and selling age-appropriate products, and they would not have purchased these products but for Sephora's long-term advertising campaign directed to tweens and teens.

27. Defendant Sephora USA, Inc. ("Sephora" or "Defendant") is a corporation engaged in the retail sale of cosmetics, skincare, beauty, and personal-care products throughout the United States, including through its retail stores and e-commerce platform. Sephora maintains its principal place of business in San Francisco, California. Sephora USA, Inc. is part of Sephora's North American operations and forms part of the LVMH Moët Hennessy Louis Vuitton group of companies.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A. Sephora Sells Thousands of Products Containing Ingredients Unsuitable for Young Skin

28. Young skin is not adult skin. The skin of children and adolescents is still developing and is generally more sensitive and more susceptible to irritation than mature adult skin. Potent ingredients designed to exfoliate the skin, accelerate cell turnover, address sun damage and hyperpigmentation, or combat signs of aging can therefore cause redness, burning, peeling, dryness, dermatitis, disruption of the skin barrier, and heightened sun sensitivity when unnecessarily or improperly used by young consumers. In some circumstances, excessive or repeated exposure to

certain active ingredients can also produce systemic effects. For example, excessive exposure to salicylates such as salicylic acid can result in salicylate toxicity, or salicylism.

29. Yet, increasingly, teens and tweens are being encouraged—particularly through social media—to adopt elaborate, multi-step skincare routines featuring precisely these types of potent active ingredients. The result is not simply that young consumers are experimenting with skincare. They are being exposed to sophisticated products and combinations of active ingredients developed primarily to address concerns associated with adult or mature skin.

30. Dermatologists have warned against this trend. In 2025, the American Academy of Dermatology advised that tweens and teens generally should avoid active ingredients such as retinol, vitamin C, and exfoliating acids because those ingredients target concerns such as wrinkles, sun damage, and uneven skin tone that children typically do not have and can irritate their thinner, more sensitive skin:

> …tweens and teens avoid products with active ingredients like retinol, vitamin C, and exfoliating acids, which target concerns like wrinkles, sun damage, and uneven skin tone, issues that children don't have. Since children's skin is still developing, it's thinner, more sensitive, and more prone to irritation than adult skin. These types of active ingredients can cause redness, burning, or peeling, and provide ***no benefit*** to such young skin.[2]

31. Certain active ingredients may be appropriate when used to treat a specific dermatological condition. The American Academy of Dermatology therefore advises young consumers to consult a board-certified dermatologist to determine what is appropriate for their skin:

> In some cases, a dermatologist may recommend a retinoid or salicylic acid—an exfoliating ingredient commonly used to treat acne—for a teen or tween… However, it's important to ***first consult with a board-certified dermatologist*** to determine what's appropriate for their skin.[3]

---

[2] Press Release, American Academy of Dermatology, *A Dermatologist's Guide to Skincare from Growing Up to Glowing Up* (Oct. 28, 2025), https://www.aad.org/news/dermatologist-guide-skincare (emphasis added).

[3] *Id.* (emphasis added).

32. The ingredients at issue in this Action—the "Unsuitable Chemicals"—include the six categories described below. The products identified herein are illustrative, non-exhaustive examples of products sold by Sephora containing one or more Unsuitable Chemicals. Because many Sephora products contain multiple active ingredients, certain products fall within more than one Unsuitable Chemical category.

33. **Alpha-Hydroxy Acids ("AHAs").** AHAs are a family of chemical exfoliants that include glycolic acid, lactic acid, malic acid, citric acid, tartaric acid, and related ingredients. AHAs work primarily at the surface of the skin by loosening and removing dead skin cells. They are commonly incorporated into products intended to improve skin texture, pigmentation, fine lines, and other concerns associated with sun-damaged or more mature skin.

34. Because AHAs exfoliate the skin, they can also cause dryness, burning, redness, irritation, peeling, and increased sensitivity to sunlight. Those effects are particularly concerning for young consumers who generally do not have the age-related skin concerns for which stronger exfoliating acids are commonly marketed and whose skin may be more sensitive to unnecessary or excessive exfoliation.

35. AHAs are pervasive in the skincare products available to young consumers at Sephora. As of July 2026, Sephora sold more than 1,200 products containing one or more AHAs. Examples include:

a. Drunk Elephant – T.L.C. Framboos Glycolic Resurfacing Night Serum;

b. Sunday Riley – Good Genes All-in-One Lactic Acid Serum;

c. The Ordinary – Glycolic Acid 7% Exfoliating and Brightening Daily Toner;

d. Dr. Dennis Gross Skincare – Alpha Beta Extra Strength Exfoliating AHA/BHA Peel Pads;

e. Glow Recipe – LHA + AHA Korean Watermelon Toner Pads for Hydration and Gentle Exfoliation;

f. Summer Fridays – Cloud Dew Gel Cream;

g. Sol de Janeiro – Bom Dia Bright Clarifying AHA BHA Body Wash;

h. Peace Out – Pore Perfecting Stick with Glycolic and Salicylic Acid for Clogged Pores; and

i. First Aid Beauty – KP Bump Eraser Body Scrub with 10% AHA.

36. A July 2025 study published in *Pediatrics* examining skincare routines depicted in youth-oriented TikTok content found AHAs to be the most common category of active ingredients in the routines studied, with an average of three of these ingredients—and as many as seven—appearing in a single routine.[4] Thus, the concern is not merely that a young consumer may use one AHA-containing product. Social media-driven multi-step routines can cause tweens and teens to layer several products containing the same or similar exfoliating ingredients, exposing their skin repeatedly and sometimes unknowingly to multiple AHAs in a single routine.

37. **Beta-Hydroxy Acids ("BHAs").** BHAs are another class of chemical exfoliants and include salicylic acid and related compounds. Unlike AHAs, which primarily act at the surface of the skin, BHAs are oil-soluble and can penetrate into pores, making them particularly common in products designed to treat acne and oily skin.

38. Some BHAs—most notably salicylic acid—may appropriately be used by certain teenage consumers, particularly to treat acne. But that does not make unrestricted or routine BHA use appropriate for every young consumer. BHAs can be unnecessarily harsh for younger children, and even salicylic acid can cause irritation when used at excessive concentrations, without an appropriate dermatological need, or in combination with other potent active ingredients such as AHAs and retinoids. Excessive exposure to salicylates can also result in systemic toxicity, including salicylism.

39. Examples of BHA-containing products sold by Sephora include:

a. Paula's Choice – Skin Perfecting 2% BHA Exfoliating Toner for Clear Skin;

b. The Ordinary – Salicylic Acid 2% Solution;

c. Glow Recipe – Strawberry Smooth BHA + AHA Salicylic Acid Serum;

[4] Molly Hales et al., *Pediatric Skin Care Regimens on TikTok*, 156 Pediatrics, no. 1 (2025), https://doi.org/10.1542/peds.2024-070309.

d. Drunk Elephant – T.L.C. Framboos Glycolic Resurfacing Night Serum;

e. Dr. Dennis Gross Skincare – Alpha Beta Extra Strength Exfoliating AHA/BHA Peel Pads;

f. Glow Recipe – Watermelon Glow PHA + BHA Pore-Tight Toner;

g. Sol de Janeiro – Bom Dia Bright Clarifying AHA BHA Body Wash;

h. Peace Out – Salicylic Acid & Hydrocolloid Acne Treatment Pimple Patches;

i. Peace Out – Salicylic Acid & Hydrocolloid Acne Day Invisible Pimple Patches; and

j. Peace Out – Pore Perfecting Stick with Glycolic and Salicylic Acid for Clogged Pores.

40. Several of these products contain both AHAs and BHAs, illustrating how a single Sephora product can expose a young consumer to multiple active exfoliating ingredients before that consumer adds any other product to her skincare routine.

41. **Vitamin C.** Vitamin C ingredients include ascorbic acid, sodium ascorbyl phosphate, magnesium ascorbyl phosphate, ascorbyl tetra-isopalmitate, ascorbyl palmitate, ascorbyl glucoside, and related derivatives. These ingredients are commonly marketed to brighten skin, fade dark spots, improve hyperpigmentation, and address visible effects of environmental and sun damage.

42. Those are generally not skincare concerns faced by children. And vitamin C derivatives can be irritating even to adult skin and may cause redness, dryness, disruption of the skin barrier, and increased sensitivity to ultraviolet ("UV") radiation. As of July 2026, Sephora sold more than 400 products containing vitamin C derivatives, making them among the most prevalent Unsuitable Chemicals available through Sephora.

43. Examples of vitamin C-containing products sold by Sephora include:

a. Drunk Elephant – C-Firma Fresh Vitamin-C Day Serum;

b. Sunday Riley – C.E.O. 15% Vitamin C Brightening Serum;

c. Summer Fridays – Cloud Dew Gel Cream;

d. OLEHENRIKSEN – Banana Bright 15% Vitamin C Dark Spot Serum;

e. Glow Recipe – Guava Vitamin C Dark Spot Brightening Treatment Serum;

f. Kiehl's Since 1851 – Clearly Corrective Dark Spot Correcting Serum with Vitamin C;

g. The INKEY List – 15% Vitamin C & EGF Brightening Serum;

h. LANEIGE – Lip Sleeping Mask, Watermelon Pop, and

i. LANEIGE – Lip Sleeping Mask – Intense Hydration Lip Treatment with Vitamin C.

44. **Retinoids.** Retinoids are vitamin A derivatives that include retinol, retinal, retinaldehyde, retinyl palmitrate, hydroxypinacolone retinoate, retinoic acid, tretinoin, adapalene, tazarotene, retinyl linoleate, retinyl acetate, retinyl propionate, and related compounds.

45. In over-the-counter skincare, retinoids are frequently incorporated into anti-aging products designed to address fine lines, wrinkles, uneven tone, and other concerns associated with mature skin. They are potent active ingredients even for adults. Adult users are commonly advised to introduce retinoids gradually—sometimes beginning with only one or two applications per week—to allow the skin to build tolerance.

46. Retinoids can cause substantial dryness, redness, burning, peeling, irritation, and increased sensitivity to UV radiation. Although a medical provider may appropriately recommend a retinoid to treat acne or another condition in a particular teen or tween, routine use of retinoids provides no corresponding age-related benefit to young consumers and can expose their developing skin to unnecessary irritation.

47. Examples of retinoid-containing products sold by Sephora include:

a. Shani Darden Skin Care – Retinol Reform with 1% Encapsulated Retinol;

b. Drunk Elephant – A-Passioni Retinol Cream;

c. Kiehl's Since 1851 – Micro-Dose Anti-Aging Retinol Serum with Ceramides & Peptide;

d. Paula's Choice – CLINICAL Anti-Aging 1% Retinol Treatment;

e. Sunday Riley – A+ High-Dose Retinol Serum; and

f. Glow Recipe – Blackberry Retinol Blemish Serum.

48. The names and marketing of several of these products themselves underscore the adult-oriented concerns they are designed to address, including products expressly marketed as "Anti-Aging," "High-Dose," or containing concentrated retinol.

49. **Peptides.** Peptides are amino-acid compounds increasingly incorporated into cosmetic skincare products for purposes associated primarily with mature skin. Different peptide formulations are marketed to stimulate collagen and elastin production, reduce the appearance of expression lines, facilitate delivery of trace elements, or prevent the breakdown of existing collagen and elastin.

50. Signal peptides, for example, are marketed to stimulate fibroblasts to produce collagen and elastin. Certain neurotransmitter-inhibiting peptides are marketed as reducing facial muscle contractions and diminishing expression lines, leading some products to be promoted as providing "topical Botox"-like effects. Other peptides are marketed to preserve collagen or support age-related skin-repair processes. Those purposes bear little relationship to the ordinary skincare needs of children whose skin is still naturally producing collagen and elastin.

51. Examples of peptide-containing products sold by Sephora include:

a. Drunk Elephant – Protini Polypeptide Firming Refillable Moisturizer with Peptides;

b. OLEHENRIKSEN – Pout Preserve Hydrating Peptide Lip Treatment;

c. Biossance – Copper Peptide (GHK-Cu) Rapid Plumping & Hydrating Serum;

d. Kiehl's Since 1851 – Better Screen UV Serum SPF 50+ Facial Sunscreen with Collagen Peptide;

e. Summer Fridays – Light Aura Vitamin C + Peptide Eye Cream;

f. Summer Fridays – Cloud Dew Gel Cream;

g. LANEIGE – Glaze Craze Tinted Polypeptide Lip Serum Treatment; and

h. Glow Recipe – Watermelon Milk Peptide Cushion Cream.

52. Again, the overlap among categories is significant. For example, certain Sephora products combine peptides with vitamin C or other active ingredients, further illustrating how young consumers may be exposed to multiple Unsuitable Chemicals through a single product.

53. **Chemical Sunscreens.** Certain chemical sunscreen ingredients, including avobenzone and oxybenzone, are contained in numerous skincare and cosmetic products sold by Sephora. Sephora itself encourages young consumers to use SPF. Yet its youth-facing materials do not meaningfully distinguish among sunscreen formulations or explain whether particular chemical sunscreen ingredients may be more or less appropriate for young or sensitive skin.

54. Avobenzone appears in numerous products sold by Sephora, including:

a. Beauty of Joseon – Day Dew Sunscreen Lightweight SPF 50;

b. innisfree – Invisible Barrier Korean Sunscreen Serum SPF 47;

c. Kiehl's Since 1851 – Better Screen UV Serum SPF 50+;

d. ISDIN – Fusion Water Magic; and

e. Shiseido – Benefiance Wrinkle Smoothing Day Cream SPF 23.

55. Oxybenzone likewise appears in products sold by Sephora, including Shiseido – Benefiance Wrinkle Smoothing Day Cream SPF 23.

56. The presence of chemical sunscreen ingredients is not necessarily apparent from the product category alone. Sunscreen actives may also appear in moisturizers, serums, tinted products, makeup, and other cosmetics, meaning a young consumer may encounter them while shopping for products that are not principally marketed as sunscreens.

57. Plaintiffs do not allege that every Unsuitable Chemical is categorically inappropriate for every member of the Tween Class and Teen Class in every circumstance. The risks and suitability of these ingredients necessarily vary depending on the age of the user, the particular ingredient and concentration, the condition being treated, and whether multiple active ingredients are used together.

58. Rather, the Unsuitable Chemicals comprise potent active ingredients that Sephora knew or should have known require age-appropriate guidance and safeguards before being promoted and sold for routine use by tweens and teens. An ingredient that may appropriately be recommended by a dermatologist to treat acne in a seventeen-year-old is not necessarily appropriate for an eleven-year-old assembling a multi-step skincare routine based on social media content. Nor does the

potential usefulness of an ingredient for a specific condition make that ingredient appropriate for routine cosmetic use by every young consumer.

59. The scale of the problem is substantial. Unsuitable Chemicals are contained in over 1,600 products that Sephora sells, which is a majority of the skincare products offered on Sephora.com.




60. Many products sold at Sephora—approximately 40% of the products containing Unsuitable Chemicals—contain more than one Unsuitable Chemical. And because young consumers increasingly follow multi-step routines involving several different products, they may unknowingly layer the same active ingredient—or multiple different Unsuitable Chemicals—over and over again in a single skincare routine.

61. Indeed, the 2025 *Pediatrics* study found that the average skincare routine depicted in the youth TikTok content studied contained six products. The researchers observed that the risk of irritation arose both from combining multiple different active ingredients and from unknowingly applying the same active ingredient repeatedly because it appeared in, for example, three different

products. While a product containing a particular Unsuitable Chemical might, standing alone and when used sparingly, pose little risk to a particular teenage consumer, that same ingredient can become problematic when combined with several other Unsuitable Chemicals as part of a routine assembled without medical supervision.

62. Sephora knows this. By November 2024, the Connecticut Attorney General had opened a formal investigation specifically concerning Sephora's marketing and advertising of skincare products to children, including the products Sephora's website returned in response to searches for "kids," "children," "tweens," and related terms. The investigation placed Sephora squarely on notice that its marketing and sale of sophisticated skincare products to young consumers presented significant consumer protection concerns.

63. Months later, Sephora added youth-specific skincare guidance to its website. Sephora now maintains a page titled "The Skincare Guide for Tweens and Teens: Less is More" (the "Tweens and Teens Guide").[5] Archived versions of Sephora's website identified by Plaintiffs indicate that the earliest archived version of the Guide dates to August 4, 2025—approximately nine months after the Connecticut Attorney General's Office commenced its investigation.

64. Thus, on information and belief, throughout much of the Class Period, Sephora did not provide young consumers with even the limited youth-specific guidance that it now maintains on its website. The timing is particularly significant because, by August 2025—and as discussed in more detail below—the "Sephora Kids" phenomenon had already received widespread national attention, Sephora executives had publicly acknowledged the influx of younger consumers into its stores, and a state consumer protection regulator had been investigating Sephora's marketing of skincare products to children for months.

65. Sephora's current Tweens and Teens Guide itself confirms Sephora's knowledge that adult skincare ingredients may be inappropriate for young consumers. The Tweens and Teens Guide

[5] Sephora, *The Skincare Guide for Tweens and Teens: Less is More*, https://www.sephora.com/beauty/teens-tweens-skincare (last visited Sept. 2, 2026).

expressly identifies five of the Unsuitable Chemicals—Retinoids, vitamin C, AHAs, BHAs, and Peptides—and acknowledges that they "may not be necessary or appropriate for younger skin."

66. Sephora's own corporate reporting further confirms the purpose of this guidance. In the LVMH Group's 2025 corporate reporting, the Tweens and Teens Guide is expressly identified as one of the "[a]ctions implemented to prevent any harm to health through the early use of cosmetic products."[6] Sephora thus recognizes not merely that young consumers have different skincare needs, but that the premature use of certain cosmetic products presents potential health concerns warranting affirmative safeguards.

67. In April 2026, after approximately seventeen months of regulatory scrutiny, Sephora entered into an agreement resolving the Connecticut investigation and agreed to a series of enforceable safeguards directed to children under thirteen. Among other things, Sephora agreed to adopt certain safeguards, including:

1. Requiring all brands that supply it with skincare products to provide Sephora with all warnings and disclaimers about the suitability of their products for children under the age of 13;

2. Clearly and conspicuously disclose these warnings and disclaimers on all pages where such products are sold on its website;

3. Require all employees who assist consumers to be trained to identify products that may not be suitable for children under 13 and provide appropriate information concerning the manufacturers' warnings and disclaimers; and

4. Maintain a resource that is clearly and conspicuously disclosed on its website that informs consumers of products that may not be suitable for children under 13.[7]

68. The investigation and resulting agreement are significant. They confirm that the suitability of adult skincare products for young consumers was not an obscure or hypothetical

---

[6] Christian Dior SE, Annual Report as of December 31, 2025, at 186 (2026), https://www.dior-finance.com/pdf/d/2/1292/2025%20Christian%20Dior%20-%20Annual%20Report%20as%20of%20December%2031%2C%202025.pdf.

[7] Press Release, Office of Att'y Gen. William Tong, *Attorney General Tong Announces Sephora to Adopt Safeguards Regarding Marketing of Anti-Aging Skincare Products to Kids Following Connecticut Investigation* (Apr. 20, 2026), https://portal.ct.gov/ag/press-releases/2026-press-releases/attorney-general-tong-announces-sephora-to-adopt-safeguards.

concern. A state consumer protection regulator investigated Sephora for precisely the type of conduct at issue here, and Sephora responded by agreeing to implement enforceable safeguards addressing the suitability of skincare products for children.

69. But those safeguards, while a good first step, remain materially incomplete. As publicly announced, the agreement requires warnings and disclaimers on Sephora's ***website***, but does not require comparable clear and conspicuous warnings on the products themselves, on store shelves, at product displays, or elsewhere at the point of sale in Sephora's physical stores. Nor does it require Sephora to establish a dedicated teen or tween section separating age-appropriate skincare products from the thousands of adult skincare products available throughout its stores. Young consumers therefore remain free to browse Sephora's broader skincare assortment without encountering clear and conspicuous age-related warnings distinguishing products that may be inappropriate for developing skin.

70. The employee training requirement is likewise limited and inadequate. It addresses products that may be unsuitable for children ***under thirteen*** and therefore provides no comparable protection for consumers ages thirteen through seventeen. And even for younger children, the safeguard is largely reactive: it requires employees to provide information only when the tween consumer affirmatively seeks or receives assistance. A tween browsing Sephora independently can therefore still select and purchase a product containing an Unsuitable Chemical without encountering any conspicuous age-related warning on the product, shelf, or display itself. And although the agreement requires employee training concerning products that may be unsuitable for children under thirteen, Sephora has not taken appropriate steps to ensure that its thousands of employees consistently understand and follow those safeguards.

71. The Connecticut investigation therefore underscores both Sephora's knowledge of the problem and the inadequacy of its response. By November 2024 at the latest, Sephora was expressly on notice that its marketing and sale of skincare products to tweens and teens raised consumer protection concerns. Yet the safeguards Sephora ultimately adopted leave significant gaps

for children shopping in physical stores and leave most members of the Teen Class outside the agreement's age-specific protections altogether.

72. The deficiencies in Sephora's response are apparent from Sephora's own website. Even today, Sephora does not make it easy for young consumers to determine which of the thousands of products it sells contain potent Unsuitable Chemicals that may be unnecessary or inappropriate for their skin.

73. The problem extends beyond products formally categorized as "skincare." Sephora carries thousands of cosmetics and personal care products, and skincare ingredients, including the Unsuitable Chemicals, increasingly appear in products marketed under other categories, including tinted sunscreens and moisturizers, highlighting and bronzing serums, foundations, and other makeup products. Thus, a tween or teen browsing Sephora's "makeup" section may encounter products containing the Unsuitable Chemicals without necessarily understanding that she is purchasing a product containing potent skincare actives.

74. Sephora's age-based skincare guidance compounds the problem. Under the "skincare" portion of its website, Sephora maintains a "Skincare for Life" guide that organizes recommendations by age. But the guide begins with consumers who are "20ish" and proceeds through "50ish+"; it contains no corresponding category for tweens or teens.

75. The recommendations directed to Sephora's youngest category—consumers who are "20ish"—include the Unsuitable Chemicals that Sephora elsewhere acknowledges may not be necessary or appropriate for younger skin. Among other things, Sephora encourages consumers in this category to "[r]each for exfoliating BHAs and pore-refining formulas":




76. A teenager navigating Sephora's principal age-based skincare guide therefore encounters an adult-oriented category recommending exfoliating acids without any adjacent warning that those same ingredients may be inappropriate for younger users. The separate Tweens and Teens Guide is not integrated into those age-based categories and instead appears through a separate, less prominent link elsewhere on the website:

**Skincare for Life**

From our young adult years through to our 50s and beyond, we know just how essential it is to have the right skincare routine. That's exactly why we've put together highly targeted solutions for specific age groups. Find the skincare you need today and get a jump on your skin goals with some help from Sephora.

For most teens and tweens, consistent use of a gentle cleanser, hydration, and SPF is the best approach. Our Skincare Resource for Teens and Tweens serves as a complementary educational resource for younger shoppers and their parents looking to find effective products and establish healthy habits. To understand what type of products are best for you and your personal goals, consult with a Sephora Beauty Advisor, in-store or online or a clinical dermatologist.

77. Even Sephora's current online Tweens and Teens Guide sends mixed messages. Although Sephora tells younger consumers that "less is more" and recommends consulting a dermatologist, it simultaneously states that "[s]kincare isn't about age; it's about taking steps to

ensure your skin is clean, healthy and protected." It also states that products containing higher concentrations of certain Unsuitable Chemicals, such as salicylic acid, "can be helpful" when "targeting certain skincare concerns, like acne."

78. Most strikingly, Sephora then advises young consumers seeking guidance about which products are appropriate for their skin to "consult a Beauty Advisor, in-store or online, or a dermatologist." In other words, Sephora places its own retail sales employees alongside qualified medical professionals as sources of advice to tweens and teens deciding whether potent Unsuitable Chemicals and higher-concentration skincare products are appropriate for their developing skin.

79. Sephora's current website thus illustrates the same deficiency left unresolved by the Connecticut agreement. Sephora knows that young consumers require different skincare guidance, but it continues to place thousands of adult-oriented products within easy reach of those consumers without providing clear, consistent, and conspicuous age-appropriate warnings at the point where those products are actually encountered and selected.

**B. Sephora's Unfair, Fraudulent, and Misleading Marketing**

80. For more than a decade, Sephora has used collaborations, experiential retail, social media, influencers, and trend-driven merchandising to promote beauty products and attract new generations of consumers. Those practices have increasingly intersected with, and ultimately intentionally targeted and capitalized on, teenagers and children twelve years old and younger.

81. As early as January 2011, Sephora partnered with Sanrio to launch Hello Kitty Beauty, an exclusive line of makeup, fragrance, and accessories sold through Sephora. Contemporary promotional materials described the collection as developed for generations of Hello Kitty fans and beauty enthusiasts and placed the products in Sephora stores nationwide.

82. Sephora heavily promoted this collaboration at launch. Among other things, Sephora conducted a "Hello Kitty Beauty" charity auction in January 2011 benefiting the Starlight Children's Foundation. Although Hello Kitty has fans of all ages, this particular collaboration intentionally associated Sephora's beauty products with a character and aesthetic having substantial recognition and appeal among young consumers.

83. Recognizing this additional revenue stream and wanting to press on with reaping profits from this new market, Sephora continued using youth-recognizable entertainment properties in subsequent years. For example, in 2012 and 2013, Sephora partnered with Disney on its "Disney Reigning Beauties" collections, creating cosmetics and accessories inspired by Disney Princess characters. The collections included products themed around Cinderella, Jasmine, and Ariel and were sold through Sephora stores and Sephora's website.

84. While these early collaborations did not expressly identify children as their intended customers, tie-ins with characters whose core fandom consists of tweens are an unmistakable decision to target children.

85. Over the following decade, the way young consumers encountered beauty products changed substantially. Sephora was well aware that social media platforms increasingly exposed teenagers and children under 13 years old to the same beauty content, products, brands, and routines consumed by adults.

86. By 2022, skincare content produced by children themselves was receiving widespread attention on social media. In December 2022, for example, then-nine-year-old North West[8] posted a "get ready with me" video to TikTok showing an extensive morning skincare and beauty routine. Teen Vogue described West at the time as a young social media influencer and detailed the multiple skincare products used in the video. This type of content helped normalize sophisticated skincare routines among increasingly young audiences and formed part of the social media environment from which the phenomenon later widely described as the "Sephora Kids" trend emerged.

87. Sephora, meanwhile, was actively investing in social media marketing and the creator economy. In March 2023, Sephora partnered directly with TikTok and advertising agency Digitas to establish the Sephora x TikTok Incubator Program. The program connected brands participating in Sephora's DEI-focused Accelerate program—which began in 2016 and offers

[8] North West is the daughter of billionaire musician Kanye West and influencer Kim Kardashian.

resources and mentorship to new and emerging brands—with established TikTok creators and trained participating brands to develop creator-focused social media strategies intended to increase their reach, growth, and engagement on TikTok.

88. The program was specifically designed around the effectiveness of creator-driven advertising. Participating brands worked with established TikTok creators, and Sephora's Vice President of Social and Influencer Marketing, Brent Mitchell, explained that the program would address both TikTok strategy and the development of a broader TikTok plan for participating brands.

89. Sephora's creator strategy extended well beyond the TikTok Incubator Program. Since 2019, Sephora has operated the "Sephora Squad," an influencer program through which Sephora selects content creators to enter into yearlong paid partnerships with the company. Sephora describes the Sephora Squad as a community of creators with engaged social media audiences and provides members with opportunities to participate in Sephora campaigns, social content initiatives, professional development, and other brand collaborations. On information and belief, Sephora knew that members of the Sephora Squad were followed by tweens and teens and that content created and promoted through the program would reach those younger audiences.

90. Sephora also provides Sephora Squad members with complimentary products specifically designed to fuel creator content. Among the stated benefits of the program are "gratis boxes" containing popular products, early access to anticipated product launches, campaign opportunities, and continued access to gratis and brand events even after the formal partnership ends. Sephora has explained that the Sephora Squad is part of a broader "ecosystem of creators" intended to influence how consumers discover products and develop purchasing habits. In other words, Sephora does not merely benefit when influencers happen to discuss its products; it has built and financially supported its own network of creators to place Sephora products into social media content and drive product discovery and demand.

91. Sephora's social media strategy to drive increased profits knowingly operated through a "reinforcing cycle" rather than through conventional advertisements alone. Creators and influencers introduced products and routines to their followers; products that generated substantial

engagement became trends; consumers then sought those products at Sephora stores and through Sephora's website and app; and consumers' subsequent reviews, "hauls," "get ready with me" videos, skincare routines, and other user-generated content further increased awareness and demand. Sephora's investment in TikTok creators and creator-focused marketing positioned it to participate in and benefit from each stage of that cycle.

92. Product gifting and so-called "seeding" further amplified that cycle. Brands sold through Sephora have sent complimentary skincare products and curated product packages to young social-media creators, encouraging the type of "unboxing," demonstration, and routine-based content that circulates rapidly among their followers. Such content does more than expose a young audience to an individual product: it presents the receipt, opening, display, and use of skincare products as an aspirational social media experience, generating additional engagement and demand among other young consumers.

93. This practice is particularly significant in the context of young influencers. Investigative reporting has found that children featured in skincare content have in many instances received free products in connection with online posts, while the commercial relationship between the child and brand is not always apparent to viewers. Because children and teenagers often discover skincare through creators they follow and identify with, product seeding can extend the reach of brand marketing well beyond a traditional paid advertisement.

94. The feedback loop was particularly powerful among younger consumers. During the Class Period, Sephora knew that a teenager or child under 13 would encounter a product through a creator they followed, see the same product repeatedly throughout TikTok's recommendation algorithm and peer-generated content, find the product at Sephora, and then contribute to the product's continued visibility by posting her own purchase, routine, review, or "haul." User-generated content thus became an additional channel through which products initially promoted by brands and creators would circulate through young consumers' personal and peer networks. In this manner, Sephora's creator-focused marketing did in fact generate broader peer-to-peer promotion

among teenagers and children under 13 years old well beyond any single sponsored post or creator partnership.

95. Sephora's conduct extended beyond the content of its advertisements. Sephora structured its business to facilitate the discovery, selection, and purchase of products by young consumers through a combination of creator relationships, product distribution, merchandising, employee interactions, and retail practices. Those practices included supplying products and other benefits to creators who could generate demand among young audiences, carrying brands expressly developed for children and teenagers alongside a much broader assortment of adult skincare, and making products containing Unsuitable Chemicals readily available without clear and conspicuous age-related warnings at the product, shelf, or display.

96. Sephora also controlled the information available to consumers at the point of sale. Sephora determined how products were categorized and displayed on its website and in its stores, what warnings or suitability information accompanied those products, and how its Beauty Advisors were trained to assist customers. Yet Sephora did not consistently identify products containing Unsuitable Chemicals as potentially inappropriate for young consumers, did not meaningfully segregate youth-appropriate skincare from adult-oriented products, and did not provide conspicuous age-related warnings where consumers actually encountered and selected the products.

97. These omissions are particularly significant because Sephora affirmatively positioned its Beauty Advisors as sources of skincare guidance. Young consumers and their parents could therefore reasonably rely on Sephora not only to sell products appropriate for their intended use, but also to train its sales personnel to identify products that may be inappropriate for children and teenagers and to provide appropriate age-related guidance before purchase. But this is not what happened in practice. In-store "Beauty Advisors" are still not appropriately trained, despite Sephora's settlement with the Connecticut Attorney General.

98. The intentionally-driven feedback loop that Sephora capitalized on is well-documented. In January 2024, for example, NBC's *Today* aired a segment addressing the growing popularity of skincare products among tweens and the role of social media in fueling that trend. The

segment featured a 12-year-old whose skincare routine was described as more expensive than her mother's and reported that tweens increasingly look to "get ready with me" videos and other social media content for skincare inspiration, including highly viewed videos posted by celebrity children such as North West. The segment explained that young consumers seek to emulate the skincare routines and products they see promoted online.

99. The segment also featured a board-certified dermatologist who explained that children in this age group are particularly susceptible to being targeted through social media and are being "marketed products that are not right for their skin." The dermatologist specifically identified AHAs, BHAs, peptides, and retinol as ingredients that can be inappropriate and potentially harmful for young skin, explaining that their use can disrupt the skin barrier and result in dryness, redness and inflammation, irritation, and acne breakouts. Rather than using skincare products containing such active ingredients, the dermatologist recommended that tweens follow a basic skincare regimen consisting of a mild cleanser, oil-free moisturizer, sunscreen, and lip balm.

100. Similarly, in March 2024, CNN profiled a nine-year-old Sephora customer who attributed her interest in skincare to TikTok and whose own videos documenting trips to Sephora received millions of views. CNN further reported that a Sephora employee observed that tweens were frequently drawn to trendy and expensive skincare brands after those products were promoted by social media influencers. Prior to and then following this CNN profile, Sephora did nothing to dissuade young customers from purchasing products sold by Sephora. Far from it.

101. Indeed, by early 2024, the influx of children into Sephora stores had become a national phenomenon. News reports described elementary-school-aged and preteen consumers frequenting Sephora in search of skincare and cosmetics they had encountered through Sephora's "reinforcing cycle" social media strategy. The term "Sephora Kids" became widely used to describe the trend. Again, at that time, Sephora did nothing to quell or tamp down younger consumers' interest in the products that it sold.

102. Other reporting described the extent to which young shoppers entered Sephora already familiar with particular brands because of Sephora's social media strategy. The phenomenon

was sufficiently pronounced that Sephora employees reported children arriving at stores seeking the products they had seen in online beauty tutorials and videos.

103. By April 2024, the commercial significance of Gen Alpha's presence at Sephora was receiving substantial business media attention. Fortune reported that "Sephora kids" were spending significant sums on skincare, including products developed for adult consumers, and described the relationship between Gen Alpha purchasing behavior, social media, and rapidly increasing beauty product sales.

104. Sephora itself expressly recognized the relationship between social media virality and the brands sold in its stores. At Fortune's Most Powerful Women Summit in October 2024, Sephora North America President and CEO Artemis Patrick discussed the influx of younger shoppers and TikTok's importance to the beauty market. Patrick stated that it was "not by accident" that many brands trending on TikTok were brands exclusively available at Sephora.

105. Patrick's statement described the same feedback loop that had emerged between social media attention and Sephora's retail business. Products became popular through TikTok and creator content; consumers then sought those brands at Sephora; and their purchases and engagement reinforced the brands' visibility online. Sephora's exclusive relationships with a number of trending brands gave it a direct commercial benefit from that cycle.

106. Youth engagement with Sephora stores continued, and Sephora continued to enjoy increased profits as a direct result. Incredibly, by January and February 2025, Sephora was aware that children's birthday parties were taking place at certain Sephora stores. News reports described tweens holding birthday celebrations at Sephora as part of the broader "Sephora Kids" and Gen Alpha beauty trend. That tweens were holding birthday celebrations at Sephora stores further demonstrates that Sephora's physical retail environment itself had become a destination for minors, not merely a place where young consumers happened to encounter skincare products.

107. By September 2025, Sephora had expanded its role in cultivating its young consumers' appetite for skincare products by adding brands expressly designed to capture that market. Sephora launched Sincerely Yours, a skincare brand co-founded by then-fifteen-year-old

social media creator Salish Matter and expressly created "with and for teens." The brand launched exclusively in hundreds of Sephora stores nationwide and on Sephora.com with four core skincare products and was promoted as providing skincare specifically formulated for developing skin.

108. Salish Matter had already built a substantial following among teens and preteens, and contemporary reporting described the launch as a significant step by Sephora into the Gen Alpha skincare market. Sephora participated in the brand's September 6, 2025 launch at the American Dream Mall in New Jersey, which featured Matter, product samples, giveaways, and other promotional activities. Reports estimated that more than 80,000 people attended, overwhelming the event and generating substantial additional press and social media attention.

109. Significantly, Sincerely Yours products themselves contain the Unsuitable Chemicals alleged herein. Plaintiffs' product-level review identified four Sincerely Yours products containing one or more Unsuitable Chemicals, including malic acid, citric acid, and/or salicylic acid. For example, Sephora currently sells Sincerely Yours' Face to Face Time Gentle Pore-Purifying Whipped Clay Mask, and Plaintiffs' review identified that product as containing one or more of those ingredients.

110. Sephora continued to expand offerings directed toward young consumers thereafter by adding Evereden, another skincare brand developed specifically for children and teenagers and promoted as a Gen Alpha skincare brand.

111. Plaintiffs' product-level review likewise identified several Evereden products sold by Sephora containing one or more Unsuitable Chemicals, specifically citric acid and/or ascorbic acid. Those products include, among others, Kids & Teen Multi-Vitamin Cleanser with Vitamins B5 & B3 (Niacinimide), which contains both ascorbic acid and citric acid; Kids & Teens Multi-Vitamin Hydrating Face Mist with Vitamins B5 & B3 (Niacinamide), which contains both citric acid and ascorbic acid; Kids & Teen Multi-Vitamin Face Cream with Vitamin E, B3, B5 (Niacinamide) & Squalane, which contains ascorbic acid; Teen Oil-Free Balancing Cleanser for Blemish-Prone Skin, which contains citric acid; Teen Oil-Free Gel-Cream Moisturizer for Blemish-Prone Skin, which contains citric acid; and Kids Cloud Face Wash, which contains citric acid.

112. This is particularly significant because these are not adult products that younger consumers merely happen to encounter. Sephora and the brands themselves expressly market these lines for children, tweens, teenagers, and "developing skin." Sephora therefore simultaneously acknowledges that young consumers require specially formulated skincare while selling youth-directed products that contain Unsuitable Chemicals that Sephora elsewhere warns "may not be necessary or appropriate for younger skin."

113. Sephora's Sincerely Yours and Evereden launches thus demonstrate two things at once: First, Sephora itself recognizes teenagers and children as a distinct and commercially valuable skincare market. Second, Sephora recognizes that tween and teen skincare needs differ from those of adults. By introducing brands expressly designed for children and teenagers into the same retail environment as anti-aging serums, chemical exfoliants, retinoids, high-concentration actives, and other products containing Unsuitable Chemicals, Sephora encouraged young consumers to treat its broader skincare assortment as part of the same accessible beauty marketplace. Sephora did so without implementing corresponding in-store labeling, product segregation, or point of sale safeguards sufficient to help these consumers distinguish between products appropriate for developing skin and products that were not.

114. By 2025 and 2026, Sephora's increasing appeal to younger consumers was therefore neither accidental, nor incidental to promoting its brand to adults. Appeal to minor girls was embedded throughout Sephora's broader marketing and merchandising ecosystem: social media-driven brands; creator and influencer marketing; product seeding and "unboxing" content; highly interactive retail stores; youth-oriented events; teen-founded brands; Gen Alpha skincare lines; and thousands of additional skincare products available only a click or shelf away.

115. By 2026, the commercial importance of Gen Alpha was being openly recognized by the beauty and retail industries, including Sephora. Industry research described Gen Alpha as an increasingly important beauty consumer segment whose product discovery and purchasing preferences were substantially influenced by social media and influencer content, including on

YouTube and TikTok. More broadly, 2025 consumer research estimated that children ages eight to fourteen influenced approximately 42% of U.S. household spending.

116. As described, Sephora's relationship with young consumers is not the product of a single advertisement or isolated campaign, but of a broader set of business practices that Sephora developed, structured, maintained, and profited from over a period of years. Those practices and long-term advertising campaign include creator and influencer relationships, product gifting and seeding, youth-oriented merchandising, the integration of teen- and Gen Alpha-focused brands into Sephora's retail ecosystem, the absence of clear and conspicuous age-related warnings at the point of sale, and the failure to adequately distinguish products appropriate for developing skin from adult-oriented skincare containing Unsuitable Chemicals.

117. Throughout that evolution, Sephora has fraudulently and falsely maintained that it does not market to children and teenagers and has stated that it has intervened when a brand sought to use a young child as a model in connection with adult skincare products. But Sephora's own business practices tell a different story: it has acknowledged the commercial importance of social media virality, invested directly in creator-driven TikTok marketing using content creators with underage followings, cultivated a physical and digital retail environment that attracts young consumers, partnered with brands and creators expressly directed toward them, launching a confusing and misleading Tweens and Teens Guide on its website, and continued to make products containing Unsuitable Chemicals readily available without safeguards commensurate with the risks Sephora itself recognizes, including failing to adequately train its nationwide in-store sales force.

## CLASS ALLEGATIONS

118. Plaintiffs bring this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3). Plaintiffs seek certification of the following two Classes:

a. **Tween Class:** All persons in the United States who, during the Class Period, purchased from Sephora one or more products containing an Unsuitable Chemical (as defined herein) for use by a minor twelve years old or younger.

b. **Teen Class:** All persons in the United States who, during the Class Period, purchased from Sephora one or more products containing an Unsuitable Chemical (as defined herein) for use by a minor between the ages of thirteen and seventeen, inclusive.

119. Excluded from the Classes are:

a. Sephora and its officers, directors, employees, subsidiaries, and affiliates;

b. governmental entities;

c. Plaintiffs' counsel and Sephora's counsel;

d. the Court and Court personnel assigned to this Action including any jurors; and

e. members of the immediate families of the foregoing.

120. **Numerosity.** The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiffs do not presently know the precise number of Class members. Sephora operates a substantial nationwide retail and e-commerce business, with approximately 1,813 retail locations in the United States, and Plaintiffs' investigation identified Unsuitable Chemicals in a majority of the skincare products offered on Sephora.com. Given the scope of Sephora's operations, the number of products at issue, and the widespread purchasing of skincare products for tweens and teens, Plaintiffs reasonably believe that each Class consists of thousands of members.

121. **Commonality.** Numerous questions of law and fact are common to the Classes, the answers to which will generate common answers capable of resolving central issues in this litigation. These common questions include, among others:

a. whether Sephora marketed and sold products containing Unsuitable Chemicals for use by tweens and teens;

b. whether Sephora knew that certain Unsuitable Chemicals may be unnecessary, inappropriate, or harmful when used by young consumers without an appropriate dermatological need;

c. whether Sephora knew that tweens and teens were purchasing and using products containing Unsuitable Chemicals as part of increasingly sophisticated, multi-product skincare routines;

d. whether Sephora's representations, omissions, marketing practices, and other conduct concerning the suitability of products containing Unsuitable Chemicals for young consumers were likely to deceive or mislead reasonable consumers;

e. whether information concerning the suitability and risks of products containing Unsuitable Chemicals for tweens and teens was material to reasonable consumers purchasing such products;

f. whether Sephora's conduct was unfair or fraudulent within the meaning of California Business and Professions Code § 17200;

g. whether Plaintiffs and members of the Classes are entitled to restitution under California Business and Professions Code § 17203; and

h. whether Sephora should be required to provide additional disclosures, warnings, or other injunctive relief concerning the marketing and sale of products containing Unsuitable Chemicals.

122. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Classes because Plaintiffs' claims arise from the same course of conduct by Sephora and are based on the same legal theories as the claims of absent Class members. Plaintiffs, like other members of the Classes, purchased products containing Unsuitable Chemicals from Sephora for use by minors and suffered economic injury as a result of the conduct alleged herein.

123. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are aligned with, and are not antagonistic to, the interests of absent Class members. Plaintiffs have retained counsel experienced in complex litigation and consumer class actions who are qualified to prosecute this action vigorously on behalf of the classes.

124. **Predominance.** The questions of law and fact common to members of the Classes predominate over questions affecting only individual members. Sephora engaged in standardized

and substantially uniform conduct concerning the marketing, sale, disclosure, and availability of the products at issue, and the principal questions concerning the legality of that conduct can be resolved through evidence common to the Classes.

125. **Superiority.** A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. The individual amounts at stake are likely insufficient to justify the burden and expense of individual litigation against Sephora. Class treatment will permit a large number of similarly situated consumers to adjudicate their common claims in a single proceeding, conserve judicial resources, avoid unnecessary duplication of evidence and expense, and reduce the risk of inconsistent adjudications concerning Sephora's conduct.

126. Plaintiffs are unaware of any difficulties that would render this action unmanageable as a class action. The Classes are defined by objective criteria, and the claims of Plaintiffs and Class members arise from a common course of conduct involving products sold through Sephora's retail and e-commerce channels.

## CAUSE OF ACTION

### Violation of California Business and Professions Code § 17200 et seq.

127. Plaintiffs incorporate by reference paragraphs 1 through 126 as though set forth in full here.

128. Beginning on an exact date unknown to Plaintiffs but at least since September 4, 2022, Sephora has committed acts of unfair competition, as defined by Business and Professions Code § 17200, by engaging in the following practices: marketing and selling products containing Unsuitable Chemicals to and for use by children and teenagers; cultivating and profiting from a youth-skincare market through social media, influencers, creator-driven marketing, youth-oriented brands, experiential retail, and other marketing channels; failing to provide adequate, consistent, and conspicuous age-appropriate disclosures concerning the suitability of products containing Unsuitable Chemicals for young consumers; and engaging in deceptive and misleading marketing practices concerning the suitability of such products for tweens and teens.

129. These acts and practices, as described in paragraph 128 above, violate Business and Professions Code § 17200 in the following respects:

a. The harm to Plaintiffs and to members of the Classes outweighs the utility of Sephora's practices and, consequently, Sephora's practices constitute unfair business acts or practices within the meaning of Business and Professions Code § 17200. Those practices include, among other things, cultivating and maintaining commercial relationships—often undisclosed—with social media influencers and creators; working with influencers and creators who have substantial followings among minors; providing or facilitating free products, gift boxes, and other consideration that generate "unboxing," review, and skincare routine content viewed by young consumers; failing to clearly and conspicuously identify, label, or warn which products contain Unsuitable Chemicals that may be unnecessary, inappropriate, or harmful for young skin; failing to provide adequate age-related warnings at the product, shelf, display, or other point of sale; failing to adequately train Sephora Beauty Advisors and other sales personnel concerning the suitability of such products for children and teenagers; and continuing to make adult-oriented skincare products readily available to young consumers without safeguards commensurate with Sephora's knowledge of the risks alleged herein. Sephora's conduct is also immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The injury caused by Sephora's conduct is substantial, is not outweighed by countervailing benefits to consumers or competition, and could not reasonably have been avoided by Plaintiffs and members of the Classes.

b. Sephora's practices of marketing and selling products containing Unsuitable Chemicals to and for use by young consumers while failing to adequately disclose that such ingredients may be unnecessary, inappropriate, or harmful for younger skin, and while simultaneously cultivating Sephora as a destination for tween and teen skincare, are likely to mislead the general public and, consequently, constitute fraudulent business acts or practices within the meaning of Business and Professions Code § 17200. Plaintiffs and members of the Classes reasonably expected and assumed that products Sephora marketed and sold for use by young consumers were safe and appropriate for their intended use, or that Sephora would clearly and

conspicuously disclose if they were not. Those expectations and assumptions were materially different from Sephora's misleading representations and omissions concerning the products at issue. Sephora's representations, omissions, and marketing practices were likely to mislead Plaintiffs and members of the Classes.

c. Sephora has engaged in a long-term advertising campaign directed to teenagers and tweens that has been and is untrue and misleading. This common advertising scheme includes its use of social media, influencers, creator-driven marketing, product gifting and "seeding," youth-oriented brands, and related promotional content to generate demand for products sold by Sephora among children and teenagers without adequately disclosing material facts concerning the suitability of products containing Unsuitable Chemicals for young consumers. Connections between endorsers—including social media influencers, creators, bloggers, and vloggers—and advertisers such as Sephora are material to consumers because such connections bear directly on the weight and credibility consumers reasonably give to an endorser's statements and recommendations. Upon information and belief, during the Class Period, certain social media influencers and creators promoting Sephora and products sold by Sephora received undisclosed consideration from Sephora, including free products, gift boxes, promotional merchandise, or other things of value, and therefore did not act wholly independently in creating the promotional content viewed by consumers. The failure to adequately disclose those material connections, together with Sephora's broader deceptive marketing scheme, was likely to mislead Plaintiffs and members of the Classes and are, by definition, violations of Business and Professions Code § 17200.

130. The unfair and fraudulent business practices and false and misleading advertising of Sephora, as described above, present a continuing threat to members of the public in that Sephora continues to market and sell products containing Unsuitable Chemicals to and for use by children and teenagers; continues to employ social media, influencer, creator-driven, and youth-oriented marketing to generate demand among young consumers; and continues to fail to provide adequate, consistent, and conspicuous age-appropriate disclosures and safeguards concerning the suitability of those products for young skin.

131. Plaintiffs and other members of the Classes have no other adequate remedy at law in that the injury alleged is not merely a difference in value. Where a product was purchased for a young consumer for whom it was unsuitable, the appropriate relief is recessionary in nature—the purchaser should be entitled to return the product for a refund or recover the purchase price where the product has been discarded or cannot reasonably be returned. To the extent any legal remedy could provide comparable relief, Plaintiffs seek equitable relief in the alternative.

132. As a result of the aforementioned acts, Plaintiffs and members of the Classes have lost money and suffered injury in fact. Sephora received and continues to hold monies paid by Plaintiffs and members of the Classes for products containing Unsuitable Chemicals that Plaintiffs and members of the Classes would not have purchased, or would not have purchased on the same terms, had Sephora adequately disclosed the material facts concerning the suitability of those products for their intended young users.

133. Plaintiffs were exposed to Sephora's common, deceptive, and long-term marketing scheme directed to tweens and teens in purchasing the products at issue, including but not limited to through social media, influencers, creator-driven content, youth-oriented branding, and the marketing ecosystem described herein and reasonably relied to their detriment on Sephora's representation—express and implied—that products it marketed and sold for use by young consumers were safe and appropriate for their intended use. Plaintiffs also reasonably relied to their detriment on the absence of clear and conspicuous warnings or disclosures indicating that the products they purchased contained Unsuitable Chemicals that may be unnecessary, inappropriate, or harmful for young skin, and on Sephora to adequately train its sales personnel to identify such products and provide appropriate age-related guidance to young consumers and their parents. Had Plaintiffs known the truth, they would not have purchased the products at issue.

**DEMAND FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the Classes defined herein, respectfully request that the Court enter judgment in their favor and against Sephora as follows:

a. Certifying this action as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiffs as representatives of the Classes, and appointing Plaintiffs' counsel as Class Counsel;

b. Awarding appropriate injunctive and other equitable relief pursuant to California Business and Professions Code § 17203, including an order enjoining Sephora from continuing the unfair and fraudulent business acts and practices alleged herein and requiring appropriate age-related disclosures and safeguards concerning the marketing and sale of products containing Unsuitable Chemicals for use by children and teenagers and adequate training for its sales personnel;

c. Awarding Plaintiffs and members of the Classes restitution of all money or property acquired by Sephora through the unfair competition alleged herein, in an amount to be determined;

d. Awarding Plaintiffs their reasonable attorneys' fees and costs to the extent permitted by applicable law, including California Code of Civil Procedure § 1021.5;

e. Awarding pre-judgment and post-judgment interest to the extent permitted by law; and

f. Awarding such other and further equitable relief as the Court deems just and proper.

Dated: September 4, 2026

Respectfully submitted,

**KIRBY McINERNEY LLP**
*s/ Robert J. Gralewski, Jr.*
Robert J. Gralewski, Jr. (CA Bar No. 196410)
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: (858) 834-2044
Email: BGralewski@kmllp.com

Lauren Wands (*pro hac vice* forthcoming)
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
Email: LWands@kmllp.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Mark C. Rifkin (*pro hac vice* forthcoming)
Thomas H. Burt (*pro hac vice* forthcoming)
Lillian R. Grinnell (*pro hac vice* forthcoming)
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Email: rifkin@whafh.com
burt@whafh.com
grinnell@whafh.com

*Counsel for Plaintiffs and the Proposed Classes*